UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
_____

LARON GLENN,

        Plaintiff,

v.

ROBERT NAPEL et al.,

        Defendants.

_____/

Case No. 2:17-cv-105

Honorable Robert J. Jonker

# **OPINION**

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

## **Discussion**

### I.    **Factual allegations**

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Marquette Branch Prison (MBP) in Marquette, Marquette County, Michigan. The events about which he complains occurred at that facility. Plaintiff sues Warden Robert Napel,

Prison Counselor Unknown Horrock, Resident Unit Manager Viitala, Correctional Officer Unknown White, Assistant Deputy Warden Erica Huss, Deputy Warden James Alexander, Correctional Officer Unknown Jeske, and Inspector Unknown Tassen.

Plaintiff alleges that he was transferred from the Ionia Maximum Correctional Facility (I-Max) to MBP on October 4, 2016, as the result of a protection request. Plaintiff's need for protection was the result of him informing Prison Counselor Nikita Haynes of a hit that the I.V.L. (Insane Vice Lords) prison gang had placed on a female officer, as well as a planned gang war. Plaintiff's information resulted in the discovery of weapons and the prevention of violence. However, other inmates discovered that Plaintiff was the informant. As a result, the Iman of the Nation of Islam (NOI) directed Plaintiff to either stab a member of the Aryan Nation, or be stabbed himself. Plaintiff had been attending NOI services as a guest of a fellow Five Percenter when the request was made via a note. Plaintiff turned the note over to the Sergeant and was subsequently transferred to MBP.

Upon Plaintiff's arrival at MBP, he met with Defendant Huss, who expressed annoyance at I-Max officials for repeatedly sending protection cases to MBP. However, Defendant Huss stated that she would send Plaintiff to a good unit and instructed him to ask for an inmate named Lawson-Bey because she thought that Plaintiff was part of the Moorish Americans. Plaintiff requested protective custody, but was assured that he would be safe, so he went to the assigned unit. Plaintiff states that a couple of months later, two inmates arrived from I-Max and confronted Plaintiff on the yard, calling him a "rat." Plaintiff states that he told the Five Percenters on the yard about the two inmates. Plaintiff later learned that the Five Percenters had planted a weapon in the cell of one of the inmates from I-Max, which resulted in that inmate being sent to segregation.

Plaintiff states that he received a letter from prisoner Lawson-Bey, informing Plaintiff that if he wished to attend the Moorish American Services, an investigation would be opened on him to find out why the Moors in Detroit had shot Plaintiff, and that he could not guarantee that nothing would happen to Plaintiff. The letter also stated that if Plaintiff did not attend services, then no investigaton would occur. Plaintiff chose not to attend services. Plaintiff states that in January of 2017, he discovered that prisoner Lawson-Bey had lied and that there was now a price on Plaintiff's head. In addition, the Five Percenters began acting oddly toward him and one member mugged Plaintiff and told him to "get out of his face." Plaintiff responded angrily. Later that day, the Five Percenter told Plaintiff that he had been testing him, but Plaintiff did not believe him. Plaintiff informed him that he would no longer be a part of the Five Percenters in MBP.

On February 8, 2017, inmate Cheno, who had been transferred to MBP from I-Max, called Plaintiff a "rat," as well as other names. Cheno threw food at Plaintiff's cell and told him to get on his knees and "eat it like the bitch" he was. After approximately 30 minutes of name calling, Plaintiff lost his temper and told Cheno that he was going to kill him during the next yard time. Plaintiff states that he had access to a knife from a Five Percenter named "Black God." Plaintiff alleges that prisoner Lawson-Bey and an I.V.L. member named Chico tried to convince Plaintiff to let the issue go, but "Black God" sent Plaintiff a note saying: "I just got word they go pop you when you go to yard so what's up?" Plaintiff later received another note from "Black God" stating that he had made Plaintiff a knife and that he and Plaintiff were going to "move on them as a team." Plaintiff asked Chico about the situation and he told Plaintiff that the problem had been resolved. Then Chico went to "Black God," who subsequently agreed with Chico. However, Plaintiff states that he sensed deception.

When Plaintiff went to the yard, officers searched him and saw a razor in Plaintiff's gloves, but acted is if they hadn't seen it and let Plaintiff proceed into the yard. Plaintiff approached inmate Cheno, who asked Plaintiff if he had a weapon. Plaintiff said he would find out. Inmate Cheno then told Plaintiff to look around. Plaintiff did and observed every officer watching them. Inmate Cheno stated that the officers had told him that Plaintiff was coming to stab him. Inmate Cheno told Plaintiff that the officers told him that Plaintiff was a child molester. Plaintiff and inmate Cheno compared notes they had both received from Black God and discovered that he had been manipulating them. Inmate Cheno was also known to be a rat and an "undercover homosexual."

Around dinner time on the same day, Plaintiff received a note from a Five Percenter named "Self-Made-Buddha-Allah," who accused Plaintiff of "teaching false science" and told Plaintiff that he was not recognized by the Five Percenter group at MBP. The following day, Plaintiff told "Self-Made-Buddha-Allah" that he had the wrong person because Plaintiff's "science" was always correct. "Self-Made-Buddha-Allah" did not answer. Another Five Percenter later told Plaintiff that "Self-Made-Buddha-Allah" had said he was going to pop Plaintiff when he went to the yard. Plaintiff subsequently requested protection and turned over all the threatening notes he had received from other prisoners. Plaintiff was placed in temporary segregation. A review of the request for protection investigation report, shows that Investigator Pokley found that Plaintiff's allegations of events at MBP, as well as at I-Max, could not be confirmed and that placement in protective custody was not warranted. However, Pokley concluded that Plaintiff should be placed in an alternate general population housing unit at MBP. *See* ECF No. 1-1, PageID.35.

On February 15, 2017, Correctional Officer Jamie Pancher approached Plaintiff's cell with a porter and ordered Plaintiff to back up and go to the yard. Plaintiff tried to explain that if he went to the yard, he was in danger of being stabbed. Officer Pancher gave Plaintiff a direct order to go to the yard, and Plaintiff refused. Plaintiff then received a misconduct ticket. When Plaintiff saw the hearing investigator, he requested the threatening notes he had received as evidence that he required protection.

On February 22, 2017, Plaintiff met with Prison Counselor Hares. While being escorted to the visitation room, Plaintiff overheard Hares telling Defendant Horrock that Plaintiff needed to stay at MBP, and that Hares was on the "same page" as Defendant Horrock. When Plaintiff confronted Hares with the fact that he had overheard the conversation, Hares stated that Plaintiff's placement was a custody issue.

On February 24, 2017, Plaintiff was found guilty of the misconduct. The misconduct hearing report states:

> At 0945 hours, Officer Pancher instructed [Plaintiff] to pack up his property as he was moving to general population. This order was valid and reasonable as [Plaintiff] was physically able to comply and faced no imminent risk of harm in doing so. He knew the order was directed to him as evidenced by his verbal response to it, "I will have to refuse. I am not going to move." [Plaintiff] did not pack his property and remains in Cell #D-9 at the time of this hearing. He is guilty of the misconduct.
>
> [Plaintiff]'s claim that he is in danger is not persuasive. The claim was investigated. SCC determined that the alleged threat was "block based" and did not prevent him from being housed in another unit. Moreover, [Plaintiff] contradicted his written statement at hearing, saying these threats have nothing to do with his [Moorish Science Temple of America] affiliation while indicating in his written statement that the 'Moors' have a $1,000 bounty on his head. Deputy Huss and [Sergeant] Lee indicated that they were not made aware of any prior housing issues by [Plaintiff] and were not advised of any concerns by other staff. Finally, the [Administrative Law Examiner] agrees that Parolee's 'fear' of going to yard has no

>       bearing on this misconduct and statements from his Psychiatrist and
>       Psychologist addressing this fear is irrelevant to the charge.

*See* ECF No. 1-1, PageID.48.  Plaintiff's appeal was denied.  Plaintiff was placed in long term segregation.

Plaintiff claims that during the SCC (Security Classification Committee) meeting, the Resident Unit Manager, who Plaintiff fails to name in his complaint, told Plaintiff that he should go to the yard, despite the fact that Plaintiff was afraid of being stabbed.  The Resident Unit Manager told Plaintiff that the only way he would be sent to protective custody was if he provided prison officials with names.  So Plaintiff gave him a kite listing the religious and street names, as well as cell numbers.  Plaintiff also told the Resident Unit Manager who had shot Plaintiff five times in 2011, that he was a Moorish American and a Washitaw, and that Plaintiff had been targeted because he witnessed a murder.  However, the Resident Unit Manager still refused to send Plaintiff to protective custody.

Plaintiff claimed that officers retaliated against him for requesting protection by telling inmates that he had raped little boys.  Plaintiff claims that one officer put something in his food, which made him sick and caused him to burp up a foreign substance.  Plaintiff claims that his weekly segregation behavior reviews consistently showed good behavior, but prison officials refused to elevate Plaintiff to stage three, where he would have been able to watch television.  However, the two segregation behavior reviews attached as exhibits to Plaintiff's complaint show that Plaintiff was appropriate with staff and other prisoners either "rarely" or "sometimes," and that his housekeeping and personal hygiene were merely adequate.  *See* ECF 1-1, PageID.75-76.

Plaintiff states that he eventually had a mental breakdown, which resulted in him standing at his bars for hours talking loudly to himself.  Plaintiff regularly spoke to his psychologist and was told that he would be placed in F-Block, which is a secured block made for mentally ill

people. Plaintiff states that because of his mental problems, he was disrespectful to everyone and made enemies with the "Bloods," who now plan to kill Plaintiff if such an opportunity arises.

Plaintiff alleges that around the end of April 2017, he became ill and developed mouth sores. Plaintiff noticed that his toothbrush was out of place, and when he checked it, he noticed that it was blackened at the bottom of the bristles. Plaintiff concluded that an officer had dirtied it with an unknown substance. Plaintiff filed a grievance regarding his toothbrush and also claiming that his food had been poisoned. Plaintiff's grievance was rejected as containing multiple issues on steps I and II. In May 2017, Plaintiff found a piece of metal in his food. Plaintiff complained about the metal, which was taken by Sergeant Nurkala to be photographed.

Plaintiff filed a grievance, prompting Defendant Jeske to call Plaintiff "ugly" and a "fuckboy." On May 25, 2017, Plaintiff called Defendant Jeske by someone else's name and she laughed. Plaintiff stated that they joked and Plaintiff asked if he could look her up on Facebook when he got out of prison. Defendant Jeske laughed and said no. About two hours later, Sergeant Johnston read Plaintiff on a sexual misconduct, which had been written by Defendant Jeske. The ticket charged Plaintiff with telling Defendant Jeske that he wanted to look her up on Facebook so he could show her what his "dick" could do. Plaintiff contested the ticket, calling Defendant Jeske a name and accusing her of lying. When Plaintiff asked Defendant Jeske why she had lied about his statement, she responded "Why do you have to be a fuckboy and write all those fucking grievances?" Plaintiff was found guilty of the misconduct following a hearing on June 1, 2017. *See* ECF 1-1, PageID.86. Plaintiff states that this misconduct conviction played a role in his parole denial.

Plaintiff claims that Defendants Napel, Viitala, Huss, Alexander, and Tassen denied him protection in violation of his Eighth Amendment rights. Defendant Horrock conspired with

7

Plaintiff's psychologist to have Plaintiff placed in administrative segregation in retaliation for requesting protection in violation of the First and Eighth Amendments. Plaintiff states that Defendant White violated his Eighth and Fourteenth Amendment rights when he poisoned Plaintiff's food in retaliation for "locking up and being a sex offender," and prevented Plaintiff from progressing to stage 3 while in segregation, so Plaintiff was never able to have a television. Plaintiff asserts that Defendant Jeske violated his Eighth Amendment rights by defiling his toothbrush and poisoning his food, and his First Amendment right by writing a retaliatory misconduct on him for filing grievances. Finally, Plaintiff makes a conclusory claim that Defendant Viitala violated the Eighth Amendment by destroying evidence that Plaintiff was in imminent danger of being attacked. Plaintiff seeks compensatory and punitive damages, as well as declaratory and injunctive relief.

## II. Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it

asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

As noted above, Plaintiff claims that Defendants Napel, Viitala, Huss, Alexander, and Tassen violated his Eighth Amendment rights by failing to protect him when he reported threats from fellow prisoners. In its prohibition of "cruel and unusual punishments," the Eighth Amendment places restraints on prison officials, directing that they may not use excessive physical force against prisoners and must also "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526-527 (1984)). To establish liability under the Eighth Amendment for a claim based on a failure to prevent harm to a prisoner, plaintiffs must show that the prison officials acted with "deliberate indifference" to a substantial risk that the defendant would cause prisoners serious

harm. *Farmer,* 511 U.S. at 834; *Helling v. McKinney*, 509 U.S. 25, 32 (1993); *Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir. 1997); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996); *Taylor v. Mich. Dep't of Corr.* 69 F.3d 76, 79 (6th Cir. 1995). *See Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001).

Inmates have a constitutionally protected right to personal safety grounded in the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). Thus, prison staff are obliged "to take reasonable measures to guarantee the safety of the inmates" in their care. *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). To establish a violation of this right, Plaintiff must show that Defendant was deliberately indifferent to the Plaintiff's risk of injury. *Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990); *McGhee v. Foltz*, 852 F.2d 876, 880-81 (6th Cir. 1988). While a prisoner does not need to prove that he has been the victim of an actual attack to bring a personal safety claim, he must at least establish that he reasonably fears such an attack. *Thompson v. County of Medina, Ohio*, 29 F.3d 238, 242-43 (6th Cir. 1994) (holding that plaintiff has the minimal burden of "showing a sufficient inferential connection" between the alleged violation and inmate violence to "justify a reasonable fear for personal safety.").

Plaintiff fails to name Defendants Napel, Alexander, or Tassen in the body of his complaint. In addition, although Plaintiff claims Defendant Viitala destroyed evidence that he was being threatened, he fails to allege any facts in support of this assertion. Finally, the Court notes that the only allegations that Plaintiff makes regarding Defendant Huss are that upon his arrival at MBP, she assigned him to a general population unit, stating that he would be safe. Plaintiff's allegations indicate that Plaintiff did not experience any problems until two months later, after two inmates arrived from I-Max. Because Plaintiff fails to allege any facts showing that Defendants Napel, Alexander, Tassen, Viitala, or Huss were aware of an imminent risk of injury to Plaintiff,

10

or that they were deliberately indifferent to such a risk, Plaintiff's failure to protect claims against these Defendants were properly dismissed.

Plaintiff also alleges that Defendant White violated his Eighth Amendment rights when he "poisoned" Plaintiff's food in retaliation for "locking up and being a sex offender," and prevented Plaintiff from progressing to stage 3 while in segregation, so Plaintiff was never able to have a television. The Eighth Amendment prohibits conduct by prison officials that involves the "unnecessary and wanton infliction of pain." *Ivey v. Wilson*, 832 F.2d 950, 954 (6th Cir. 1987) (per curiam) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981)). The deprivation alleged must result in the denial of the "minimal civilized measure of life's necessities." *Rhodes*, 452 U.S. at 347; *see also Wilson v. Yaklich*, 148 F.3d 596, 600-01 (6th Cir. 1998). The Eighth Amendment is only concerned with "deprivations of essential food, medical care, or sanitation" or "other conditions intolerable for prison confinement." *Rhodes*, 452 U.S. at 348 (citation omitted). Moreover, "[n]ot every unpleasant experience a prisoner might endure while incarcerated constitutes cruel and unusual punishment within the meaning of the Eighth Amendment." *Ivey*, 832 F.2d at 954.

Plaintiff fails to allege any facts in support of his claim that Defendant White poisoned his food. Without such factual allegations, this claim is properly dismissed as entirely conclusory. Conclusory allegations of unconstitutional conduct without specific factual allegations fail to state a claim under § 1983. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-69 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Nor does Plaintiff allege any specific facts indicating that Defendant White had any involvement in preventing Plaintiff from progressing to stage 3 while in segregation. Moreover, Plaintiff's claim that he could not have a television does not rise to the level of an Eighth Amendment violation. In addition, because Plaintiff has failed to

11

make specific factual allegations against Defendant White, his Fourteenth Amendment claims are also properly dismissed. *Ashcroft*, 556 U.S. at 678-69; *Bell Atl. Corp.*, 550 U.S. at 555.

Plaintiff alleges that Defendant Jeske violated his Eighth Amendment rights by defiling his toothbrush and poisoning his food. However, Plaintiff fails to allege any facts showing that Defendant Jeske had any involvement in the defiling of his toothbrush, or in the poisoning of his food. Because Plaintiff's Eighth Amendment claim against Defendant Jeske is entirely conclusory, it is properly dismissed.

Plaintiff claims that Defendant Horrock violated his Eighth Amendment rights when he conspired with Plaintiff's psychologist to have Plaintiff placed in segregation. Placement in segregation is a routine discomfort that is "'part of the penalty that criminal offenders pay for their offenses against society.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (quoting *Rhodes*, 452 U.S. 337, 347 (1981); *see also Jones v. Waller*, No. 98-5739, 1999 WL 313893, at *2 (6th Cir. May 4, 1999). The Sixth Circuit has held that without a showing that basic human needs were not met, the denial of privileges as a result of administrative segregation cannot establish an Eighth Amendment violation. *See Evans v. Vinson*, 427 F. App'x 437, 443 (6th Cir. 2011); *Harden-Bey v. Rutter*, 524 F.3d 789, 795 (6th Cir. 2008). Therefore, Plaintiff's Eighth Amendment claim against Defendant Horrock is properly dismissed.

Plaintiff claims that Defendants Jeske and Horrock violated his First Amendment right to be free from retaliation. Retaliation based upon a prisoner's exercise of his or her constitutional rights violates the Constitution. *See Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). In order to set forth a First Amendment retaliation claim, a plaintiff must establish that: (1) he was engaged in protected conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from engaging in that conduct; and (3) the

adverse action was motivated, at least in part, by the protected conduct. *Id.* Moreover, a plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct. *See Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001) (citing *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)).

Plaintiff claims that Defendant Horrock retaliated against him when he conspired with his psychologist to have Plaintiff placed in administrative segregation in retaliation for requesting protection. Assuming that a request for protection is protected conduct, Plaintiff fails to allege facts showing that Defendant Horrock was motivated by a desire to retaliate against Plaintiff for making the protection request. The allegations in Plaintiff's complaint indicate that Plaintiff was placed in long term segregation as the result of a misconduct conviction on a ticket written by Officer Pancher. Plaintiff's exhibits show that the Hearing Officer was M. Zeller. *See* ECF 1-1, PageID.48. The Court notes that a defendant's statements or conduct are not evidence of retaliation if the defendant is not the decisionmaker taking the alleged adverse action. *Smith v. Campbell*, 250 F.3d 1032, 1038 (6th Cir. 2001); *Shehee v. Luttrell*, 199 F.3d 295, 301 (6th Cir. 1999). Nothing in Plaintiff's complaint indicates that Defendant Horrock had any involvement in Plaintiff's placement in segregation. Consequently, Plaintiff's retaliation claim against Defendant Horrock is properly dismissed.

Finally, Plaintiff alleges that Defendant Jeske wrote a retaliatory misconduct ticket on him for filing grievances on her. Plaintiff attaches a copy of both the ticket and the hearing report to his complaint. *See* ECF 1-1, PageID.86-87. According to the hearing report, Plaintiff was alleging that Defendant Jeske's misconduct was in retaliation for grievances which he had written over a year prior to the date of the misconduct charge:

> I find the prisoner is guilty; I base this upon the report which is logical and persuasive. The prisoner made a comment to the officer

13

> as she escorted him back to the cell which was of a sexual nature. He asked that when he got out of prison could he hit her up on Facebook. Then he added "I want to show you what this dick do." This was a comment of a sexual nature intended to upset and annoy the officer. The prisoner claimed he had written grievances and complaints on this staff member among others for various reasons. He indicated this was retaliation. I do not find that likely or logical. It is not likely or logical she would wait over a year to write a sexual misconduct in order to retaliate. It is not likely she would make up this scenario about asking her if she wanted to see his dick on Facebook. This is not the type of misconduct one would fabricate. This prisoner made the sexually related comment to the officer to see if she was receptive to his advances. He asked if she wanted to see his dick (penis). Whe she rebuffed him he now said it was all fabricated. That is not persuasive.

*Id.* at PageID.86. Plaintiff's three page statement regarding the issue was read into the record. Plaintiff was present at the hearing. Plaintiff's questions to a witness were deemed not necessary because the witness was not present at the time Plaintiff made the statement. *Id.*

A prisoner's claim that he was falsely accused of a major misconduct is barred where there has been a finding of guilt based on some evidence of a violation of prison rules. *See Peterson v. Johnson*, 714 F.3d 905, 917 (6th Cir. 2013) (holding that a factual finding in a major misconduct proceeding has preclusive effect and is not subject to challenge in a § 1983 action). In *Peterson*, a Michigan prisoner, claimed that two corrections officers violated his Eighth Amendment right against cruel and unusual punishment. *Id.* Peterson's claim arose from an incident in which Officers Johnson and Lindy were trying to put Plaintiff in his cell. *Id.* at 908. During the alleged incident, Johnson's hand became stuck in the cell just as the door began to close. Johnson frantically called out to Lindy to stop the door from shutting on his hand. *Id.* The sole factual dispute in the case was why Johnson's hand was in the cell. Peterson claimed that Johnson put his hand in the cell as an excuse to pull Peterson out and assault him, while Johnson maintained that Peterson grabbed Johnson's hand and pulled it into the cell. *Id.* Peterson was

14

charged with a major misconduct for assault and battery as a result of the incident. *Id*. The hearing officer concluded that Peterson grabbed Johnson's hand and found him guilty of the misconduct.

The Sixth Circuit considered whether the factual finding of the hearing officer that Peterson grabbed Johnson's hand had a preclusive effect on Peterson's Eighth Amendment claim. To resolve the question, the Court looked to the Supreme Court's decision in *University of Tennessee v. Elliott*, which explained that "when a state agency acting in a judicial capacity resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." 478 U.S. 788, 799 (1986) (citation, internal quotation marks, and edits omitted). The *Elliott* Court identified four criteria for according preclusive effect: (1) whether the state agency acted in a judicial capacity; (2) whether the hearing officer resolved a disputed fact that was properly before him; (3) whether the party to be precluded had an adequate opportunity to litigate the factual dispute; and (4) if the other three criteria are satisfied, the finding is given the same preclusive effect as it would be given in state courts. *Peterson*, 714 F.3d at 912-13 (*citing Elliott*, 478 U.S. at 799). After applying the four criteria to the Michigan Department of Corrections major misconduct hearing process, the Sixth Circuit in *Peterson* concluded that the Michigan courts would grant preclusive effect to the hearing officer's finding that Peterson grabbed Johnson's hand.[1] *Peterson*, 714 F.3d at 917.

A year later, in *Roberson v. Torres*, 770 F.3d 398 (6th Cir. 2014), the Sixth Circuit faced the same question in another § 1983 civil rights action alleging excessive use of force. The

---

[1] By its terms, preclusion under *Peterson* is limited to misconduct proceedings conducted by a hearing officer under MICH. COMP. L. § 791.251 et seq., which expressly govern only major (Class I) misconducts. The procedural hearing protections for major misconducts are not available for minor misconducts. MICH. COMP. L. § 791.251(5) (expressly providing that hearings before hearings officers are not available for minor misconduct charges).

Court limited its holding in *Peterson* and held that the question of preclusion had to be decided on a case-by-case basis. The court stated in part:

> To the extent that Torres argues that, in light of *Peterson*, any factual findings by a hearing officer in a major-misconduct hearing in a Michigan prison are to be accorded preclusive effect, we reject such a reading of *Peterson* as overbroad. *Peterson* is not a blanket blessing on every factual finding in a major-misconduct hearing. Although the language of our opinion in *Peterson* is at times categorical, our decision to accord preclusive effect to particular findings from Peterson's prison hearing necessarily turned, at least in part, on the particular circumstances of Peterson's case. Indeed, the question of preclusion cannot be resolved categorically, as it turns on case-specific factual questions such as what issues were actually litigated and decided, and whether the party to be precluded had sufficient incentives to litigate those issues and a full and fair opportunity to do so – not just in theory, but in practice. *Id.* at 916–17. It likewise turns on the court's "sense of justice and equity," *Blonder–Tongue Labs., v. Univ. of Ill. Found.*, 402 U.S. 313, 334, 91 S. Ct. 1434, 28 L. Ed. 2d 788 (1971), which may require a case-by-case analysis of surrounding circumstances.

*Roberson*, 770 F.3d 398, 404-05. It is clear to the Court that Plaintiff had a suffucient opportunity to argue that the misconduct was retaliatory during the hearing. Hearing Officer Mohrman resolved the disputed fact regarding whether Plaintiff made a sexual comment to Defendant Jeske after considering the contents of Plaintiff's three page written statement, and found Plaintiff's defense to be unpersuasive, in part because of the time which had elapsed between Plaintiff's grievances against Defendant Jeske and the date of the ticket. Therefore, pursuant to the Sixth Circuit's decisions in *Peterson* and *Roberson*, the Court concludes that Plaintiff's retaliation claim against Defendant Jeske is properly dismissed.

## **Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Defendants will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the Court dismisses the action, the Court discerns no good-faith basis for an appeal. Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A Judgment consistent with this Opinion will be entered.


Dated: January 17, 2018 /s/ Robert J. Jonker
ROBERT J. JONKER
CHIEF UNITED STATES DISTRICT JUDGE